# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAM PATRICK SHEEHAN and MARK JOSEPH SHEEHAN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0333-AML |
| ASSUREDPARTNERS, INC., ASSUREDPARTNERS OF VIRGINIA, LLC, DOLPHIN HOLDCO, L.P., DOLPHIN INVESTMENT, L.P., and DOLPHIN GP, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Submitted: February 21, 2020
Decided: May 29, 2020

## <u>MEMORANDUM OPINION</u>

**Upon Defendants' Motion to Dismiss: Granted in Part, Denied in Part**

**Attorneys and Law Firms**

Martin S. Lessner, Esquire, Lauren Dunkle Fortunato, Esquire, and Kevin P. Rickert, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Attorneys for Plaintiffs William Patrick Sheehan and Mark Joseph Sheehan.

Gregory P. Williams, Esquire, Blake Rohrbacher, Esquire, Matthew D. Perri, Esquire, and Kevin M. Regan, Esquire, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, Joseph G. Santoro, Esquire, and Roger W. Feicht, Esquire, of GUNSTER, West Palm Beach, Florida, Attorneys for Defendants AssuredPartners, Inc., AssuredPartners of Virginia, LLC, Dolphin Holdco, L.P., Dolphin Investment, L.P., and Dolphin GP, Inc.

LEGROW, J

In December 2014, the founders of an insurance agency, Sheehan Insurance Service, Inc., sold their company to buyer pursuant to an asset purchase agreement. To complete this transaction, the founders also entered into an earn-out agreement, employment agreements calling for the founders' continued employment with the company, a limited partnership agreement, and an equity incentive plan with buyer. To incentivize performance at the newly acquired company, buyer offered management employees of Sheehan Insurance Service, Inc. the opportunity to invest in buyer by becoming limited partners of buyer's ultimate parent company at the top of a waterfall of subsidiaries. This offer included the right to purchase Class A-2 Interests and eligibility to be awarded Class B Profits Interests in buyer's ultimate parent company.

On February 12, 2019, buyer terminated the founders' employment, classifying the termination as "for cause." Thereafter, buyer's parent company informed the founders that it was repurchasing their Class A-2 Interests for cost and cancelling their Class B Profits Interests. The founders initiated this action against buyer and several other related corporate entities, including the parent company, alleging non-compliance with the earn-out agreement, employment agreement, limited partnership agreement, and equity incentive plan.

Defendants have moved to dismiss all counts for failure to state a claim. For the reasons that follow, I dismiss several of the founders' claims under Rule

1

12(b)(6). The founders' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment survive under the minimal pleading standard applicable to a motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the first amended complaint (the "Amended Complaint") and the documents it incorporates by reference. In December 2014, Plaintiffs William Patrick Sheehan ("Pat")[1] and Mark Joseph Sheehan ("Mark" and together with Pat, the "Sheehans") sold their insurance agency, Sheehan Insurance Service, Inc. ("Sheehan Insurance"), to Defendants AssuredPartners of Virginia, LLC ("AP Virginia") and AssuredPartners, Inc. ("AP Inc." and together with AP Virginia, "AssuredPartners").[2] In connection with the sale, the Sheehans and AP Virginia signed employment agreements (the "Employment Agreements").[3] According to the Sheehans, AP Virginia and AP Inc. both are bound to the Employment Agreements signed by AP Virginia.[4] The Sheehans continued to work for the business until their termination in February

---

[1] The Court uses the founders' first names for clarity. No disrespect is intended.

[2] Am. Compl. ¶ 2.

[3] *See* APA, Schedule 4.20, Pat Employment Agreement (hereinafter, "Pat Employment Agreement"); APA, Schedule 4.20, Mark Employment Agreement (hereinafter, "Mark Employment Agreement" and together with the Pat Employment Agreement, "Employment Agreements").

[4] *Id.* ¶ 73.

2

2019.[5] Plaintiffs aver the AssuredPartners entities "operate as a single entity under the control of [AP Inc.]"[6]

## A. The AssuredPartners Entities

AP Inc. is a parent corporation of AP Virginia.[7] AP Inc. owns non-party AssuredPartners Capital, Inc., which in turn owns AP Virginia.[8] Defendant Dolphin Holdco, L.P. ("Dolphin Holdco") owns and controls the AssuredPartners entities at the top of a waterfall of subsidiaries.[9] Specifically, Dolphin Holdco wholly owns Dolphin Topco, Inc. ("Dolphin Topco"), which wholly owns Dolphin Midco, Inc., which wholly owns AP Inc.[10] Dolphin GP, Inc. ("Dolphin GP") serves as the general partner of Dolphin Holdco.[11] Dolphin Investment, L.P. ("Dolphin Investment") is the majority limited partner of Dolphin Holdco.[12] The Dolphin Holdco Limited Partnership Agreement ("Dolphin Holdco LPA") refers to Dolphin Investment as the "Apax Limited Partner."[13]

Non-parties Apax VIII-AIV A L.P. and Apax VIII-AIV B L.P. (together, "Apax VIII") control AssuredPartners through their ownership and control of

---

[5] *Id.* ¶ 2.
[6] *Id.* ¶ 73.
[7] *Id.* ¶ 134.
[8] *Id.* ¶¶ 55-56. At the time of the Sheehans' employment with AssuredPartners, AP Virginia was known as Dawson MidAtlantic, LLC.[8] For clarity, the Court refers to the buyer as AP Virginia throughout this opinion.
[9] *Id.* ¶¶ 28, 53.
[10] *Id.* ¶ 28.
[11] *Id.* ¶ 29.
[12] *Id.* ¶ 26.
[13] *Id.*

Dolphin Holdco.[14]  Apax VIII owns and controls both Dolphin GP and Apax Limited Partner.[15]  Non-party GTCR (AP) Investors LP ("GTCR") is a Delaware limited partnership and a private equity fund.[16]  Apax VIII sold its majority interest in AssuredPartners to GTCR shortly after the Sheehans' termination.[17]

## B. The APA

Through the APA, substantially all of Sheehan Insurance's assets were sold to AP Virginia.[18]  The APA provided for an Earn-Out Period lasting from December 1, 2014 through November 30, 2016.[19]  Within 90 days of the end of the Earn-Out Period, AP Virginia was required to calculate an Earn-Out Amount and deliver to Sheehan Insurance an Earn-Out Statement setting forth a calculation of the Earn-Out Amount with reasonable supporting documentation.[20]

## C. The Employment Agreements

The Employment Agreements are comprised of two separate agreements for Pat and Mark.[21]  Pat and AP Virginia signed Pat's employment agreement, whereby, Pat accepted the position of President of AssuredPartners' Haymarket, Virginia

---

[14] *Id.* ¶ 25.
[15] *Id.*
[16] *Id.* ¶ 106.
[17] *Id.*
[18] *Id.* ¶ 71.
[19] *Id.* ¶ 72; Exhibit 2 (hereinafter, "APA") §§ 1.19, 1.54.
[20] Am. Compl. ¶ 72; APA §2.06(c).
[21] Am. Compl. ¶ 74.

operations.[22] Pat's employment agreement sets forth his specific duties and obligations in his role as an officer:

> During the Employment Period, Employee shall serve as President of the Haymarket, Virginia operations of the Company and shall have the normal duties and responsibilities associated with such position, and such other duties and responsibilities as reasonably directed by [Tim Riley,] the President of the Company, subject in each case to the power of the board of directors of the Company to expand, limit or otherwise alter such duties, responsibilities, positions and authority and to otherwise override actions of officers.[23]

Mark similarly signed an employment agreement with AP Virginia that substantially was the same as Pat's.[24] Mark accepted the position of insurance producer.[25] Mark's employment agreement sets forth the following duties and obligations:

> During the Employment Period, Employee shall serve as an insurance producer of the Company and shall have the normal duties and responsibilities associated with such position, and such other duties and responsibilities as reasonably directed by [Tim Riley,] the President of the Company, subject in each case to the power of the board of directors of the Company to expand, limit or otherwise alter such duties, responsibilities, positions and authority and to otherwise override actions of officers.[26]

---

[22] *See* Pat Employment Agreement § 1.3.
[23] Am. Compl. ¶ 74.
[24] *See id.* ¶ 75; Mark Employment Agreement § 1.3.
[25] *Id.*
[26] *Id.*

The Employment Agreements permitted the Sheehans' employment to be terminated two ways: "with or without Cause."[27] Section 1.4.2 of the Employment Agreements sets forth seven grounds for a termination "with cause":

(i) a violation by Employee of any of the terms of this Agreement or of any written policy of the Company provided or made available to Employee (excluding any immaterial violation that does not actually harm the Company); (ii) frequent unexplained absence or other malfeasance by Employee; (iii) refusal or material failure by Employee to perform the services reasonably required of Employee by the Company; (iv) the commission by Employee of a felony or an act of moral turpitude; (v) a failure to observe policies and/or standards (excluding any immaterial failure that does not actually harm or potentially harm the Company), or a failure to observe applicable laws, in each case regarding employment practices (including nondiscrimination and sexual harassment policies); (vi) loss or suspension of Employee's license to write insurance in the Commonwealth of Virginia; and/or (vii) conduct which could reasonably be expected to bring the Company or any of its affiliates into public disgrace or disrepute.[28]

The Employment Agreements also prohibit either party from disparaging the other during or after the employment term.[29] In addition, the Employment Agreements contain a non-solicitation and non-interference provision that restricts the Sheehans from soliciting AssuredPartners' clients or employees for two years after their employment ends.[30] Finally, the Employment Agreements contain an

---

[27] Employment Agreements § 1.2.
[28] *Id.* § 1.4.2.
[29] Am. Compl. ¶ 76; Employment Agreements § 6.
[30] Am. Compl. ¶ 77; Employment Agreements § 3.

attorneys' fee clause that allows a party prevailing in litigation to recover its fees from the other side.[31]

## D. The Dolphin Holdco LPA

In connection with the sale of Sheehan Insurance to AP Virginia, Mark and Pat were offered—and accepted—the opportunity to purchase Class A-2 Interests in Dolphin Holdco.[32] These A-2 interests made the Sheehans "Management Limited Partners" in Dolphin Holdco.[33] According to Plaintiffs, both AssuredPartners and the Dolphin Holdco LPA made clear that the only way for Management Limited Partners to profit from their investment was through the exercise of contractual rights to sell their limited partnership interests when Apax Limited Partner sold its interests in Dolphin Holdco or Apax VIII sold its interests in Apax Limited Partner.[34] In a March 28, 2017 email, the Sheehans were informed:

> You will not have access to this investment until APAX Partners (our private equity sponsor) exits its investment in Parent, which is an uncertain time frame. Although no exit timeframe can be estimated or guaranteed, APAX Partners often holds investments for five years or longer. Thus any investment you make in Parent will be illiquid and likely unavailable to you for multiple years.[35]

---

[31] Am. Compl. ¶ 78; Employment Agreements § 18.
[32] Am. Compl. ¶ 6.
[33] *Id.* ¶ 4.
[34] *Id.* ¶ 39.
[35] *Id.*

7

The Management Limited Partners' only opportunity to liquidate their interests was through (i) exercise of Tag-Along Rights, or (ii) forced sale through Apax Limited Partner's Drag-Along Rights.[36]

### 1. The Tag-Along Rights

Under the Dolphin Holdco LPA, if Apax Limited Partner received an offer to sell its interests in Dolphin Holdco, or if Apax VIII received an offer to sell its interests in Apax Limited Partner, Apax Limited Partner was required to negotiate with the potential acquirer to also purchase, on the same terms and conditions, the Management Limited Partners' interests.[37] Section 4.2 of the LPA provides:

> The Apax Limited Partner (the Selling Limited Partner") shall not sell or otherwise Transfer all or any number of its Class A-1 Units (other than to a Permitted Transferee or pursuant to a Required Sale or Initial Public Offering, or as contemplated by Section 4.6(a)) unless the terms and conditions of such Transfer include an offer, on the same economic terms and conditions as the offer by the proposed third party transferee to the Selling Limited Partner, to each of the other Limited Partners who is not the Selling Limited Partner or the proposed third party transferee (if such purchaser is a Limited Partner) (collectively, the "Tag Offerees"), to include at the option of each Tag Offeree, in the sale or other Transfer to the third party transferee, a number of Class A-2 Units owned by each Tag Offeree determined in accordance with this Section 4.2.[38]

If the potential acquirer was not willing to increase its offer to purchase all the interests being offered by Apax Limited Partner or Apax VIII, Apax Limited Partner

---

[36] *Id.*

[37] *Id.* ¶ 40.

[38] Am. Compl. Ex. 1 (hereinafter, "Dolphin Holdco LPA") § 4.2(a).

8

was required to decrease the number of interests it had offered.[39]  Specifically, Section 4.2(c) of the Dolphin Holdco LPA provides:

> If the proposed third party transferee is unwilling to purchase all of the Class A Units proposed to be Transferred by the Selling Limited Partner and all exercising Tag Offerees [] then the Selling Limited Partner and each exercising Tag Offeree shall reduce, on a pro rata basis based on their respective Sharing Percentages, the Pro Rata Share of the Class A Units that each otherwise would have sold so as to permit the Selling Limited Partner and each exercising Tag Offeree to sell the amount of Class A Units that the proposed third party transferee is willing to purchase.[40]

Since the Tag-Along Rights were the primary benefit of the Dolphin Holdco LPA for Management Limited Partners, Apax Limited Partner was required to provide adequate notice to Management Limited Partners of a potential transaction that triggered the Tag-Along Rights.[41]  As part of a sale of their limited partnership interests, Management Limited Partners also could convert their Class B Profits Interests into Class A-2 Interests.[42]

## 2. The Drag-Along Rights

The Dolphin Holdco LPA also granted the Apax Limited Partner Drag-Along Rights, that is the right to force Management Limited Partners to sell their limited

---

[39] Am. Compl. ¶ 40.
[40] Dolphin Holdco LPA § 4.2(c).
[41] Am. Compl. ¶ 41; Dolphin Holdco LPA § 4.2(b).
[42] Am. Compl. ¶ 42.

9

partnership interests.[43]    The Dolphin Holdco, L.P. Confidential Information Memorandum provides:

> [I]f [Apax Limited Partner] requires the holders of vested Profits Interests to transfer such units in a 'drag-along' transaction or a 'tag-along' transaction or, in certain circumstances, in connection with an initial public offering, such holders may elect to convert, subject to certain conditions, their vested Profits Interest Units into the equivalent value of Class A-2 Units, based upon a hypothetical liquidation of the Partnership at the time you elect to convert such Profits Interest Units, as further described in the New Partnership Agreement.[44]

In the event of a sale caused by Apax Limited Partner's exercise of its Drag-Along Rights, the Management Limited Partners also could convert their vested Class B Profits Interests into Class A-2 Interests.[45]

## E. Equity Incentive Plan

The Class A-2 Interests and Class B Profits Interests were governed by the Dolphin Holdco LPA and its related Dolphin Holdco, L.P. Equity Incentive Plan (the "Equity Incentive Plan").[46]

Under the Equity Incentive Plan, termination of a Management Limited Partner's employment triggered certain rights held by Dolphin Holdco and the Apax Limited Partner.[47]  For example, within six months of termination, Dolphin Holdco and Apax Limited Partner could repurchase the Management Limited Partner's

---

[43] Am. Compl ¶ 43.
[44] Dolphin Holdco, L.P. Confidential Info. Mem. at 30.
[45] Dolphin Holdco LPA § 4.1(f).
[46] Am. Compl. Ex. 3 (hereinafter, "Equity Incentive Plan") § 9(q).
[47] Am. Compl. ¶ 44.

10

interests.[48]   The consideration received by the terminated Management Limited

Partner depended on whether the termination was "for cause" or without cause.[49]

The Equity Incentive Plan defines "cause" differently from the Employment

Agreements.  Under the Equity Incentive Plan, "cause" means:

> i. The Participant's gross negligence or Participant's continuing failure to perform his or her duties and obligations for the Employer or any of its subsidiaries in any material respect or willful failure to follow lawful directions of the Board, other than due to illness or incapacity or other company-approved absences (including vacation);

> ii. Conduct causing the Employer or any of its subsidiaries material economic harm or substantial public disgrace;

> iii. Conviction of, indictment, or plea of 'guilty' or 'no contest' to, a felony or crime of moral turpitude;

> iv. Willful misconduct, fraud or embezzlement, by Participant involving the Employer or any of its subsidiaries, or any theft, misrepresentation or dishonesty by Participant involving the Employer or any of its subsidiaries intended to result in personal enrichment of Participant;

> v. Unauthorized use or disclosure of proprietary information of the Employer or any of its subsidiaries, which use or disclosure causes material harm to the Employer; or

> vi. Participant's material violation of any material policies of the Employer or any of its subsidiaries which have been communicated to the Participant, or any violation of any Restrictive Covenants.[50]

---

[48] Dolphin Holdco, L.P. Confidential Info. Mem. at 26; Equity Incentive Plan § 7.
[49] Am. Compl. ¶ 46.
[50] Equity Incentive Plan § 2.

11

Section 6 of the Equity Incentive Plan described how the general partner may cause Units to be issued, transferred or sold.[51] Section 6(c) provides:

> Except as otherwise provided in an Award Agreement, if a Participant's Employment is terminated, (i) the Award Agreement shall terminate as to all Class B Profits Interest Units covered by the Award which remain unvested and such Class B Profits Interest Units shall be forfeited without consideration, as set forth in the Award Agreement and (ii) all Units issued, transferred or sold to such Participant will be subject to repurchase provisions set forth in the Plan and/or the applicable Award Agreement. The General Partner may, however, provide for complete or partial exceptions to this requirement as it deems appropriate in its sole discretion.[52]

Section 7 of the Equity Incentive Plan discussed Dolphin Holdco's or Apax Limited Partner's rights to repurchase units after the Management Limited Partner was terminated.[53] Regardless of termination for or without cause, the Management Limited Partner would receive consideration in exchange for its Class A-2 Interests, but the amount of consideration could vary drastically.[54] If a Management Limited Partner's employment with AssuredPartners was terminated without cause, Dolphin Holdco or Apax Limited Partner only could repurchase the Management Limited Partner's Class A-2 Interests and Class B Profits Interests for Fair Market Value, as defined by the Dolphin Holdco LPA.[55] If, however, a Management Limited

---

[51] *Id.* § 6.
[52] *Id.* § 6(c).
[53] *Id.* § 7.
[54] Am. Compl. ¶ 48.
[55] *Id.* ¶ 49. The Dolphin Holdco LPA defines Fair Market Value as "the fair market value per Limited Partnership Unit as determined by the GP Board in good faith based upon the amount such Limited Partnership Unit would have received in the event of a hypothetical third party arm's

Partner's employment with AssuredPartners was terminated "for cause," Dolphin Holdco or Apax Limited Partner could repurchase the Management Limited Partner's Class A-2 Interests for the lesser of: (i) the Fair Market Value of those Interests, or (ii) the amount paid by the Management Limited Partner to acquire the Interests.[56] Additionally, any vested or unvested Class B Profits Interests previously awarded to the Management Limited Partner were forfeited and cancelled without consideration.[57]

## F. The Sheehans' termination and unit repurchase

After the APA's Earn-Out Period, the completion of several multiple internal and external audits by AssuredPartners, and nearly four years of successful employment, AssuredPartners raised "concerns" about Sheehan Insurance's pre-closing liabilities and certain Earn-Out Period record-keeping.[58] AssuredPartners first surfaced those concerns in October 2018, four months before AssuredPartners agreed to enter a $5 billion transaction with GTCR on February 20, 2019.[59] According to the Sheehans, the GTCR transaction created a windfall for its Management Limited Partners when the merger closed on May 13, 2019.[60]

---

length sale of the assets and liabilities of the Partnership on such date based on such factors as the GP Board considers relevant and in which the net proceeds of such sale were distributed to the Partners pursuant to Section 7.1 of this [LPA]." Dolphin Holdco LPA, Ex. A.

[56] Am. Compl. ¶ 50.

[57] Equity Incentive Plan § 6(d).

[58] Am. Compl. ¶¶ 82-83, 106, 108.

[59] *Id*.

[60] *Id*. ¶¶ 106, 108, 112.

Between October and December 2018, AssuredPartners requested financial information regarding the Earn-Out Period, and the Sheehans attempted to meet those demands.[61] The Sheehans, however, aver they had no access to records in AssuredPartners' possession, having delivered all Sheehan Insurance's books and records pursuant to the APA.[62] AssuredPartners eventually sent a letter on December 13, 2018, demanding Pat pay $4.7 million to AssuredPartners within eight days.[63] Pat did not make that payment. The letter also alleged Pat intentionally violated certain sections of the APA, including: (1) "certain carrier direct bill commission revenue continued to be deposited into at least one Sheehan Insurance bank account and was not forwarded to the Company" in violation of Section 6.04; (2) "some funds sent to this account were used to pay agency operating expenses but were not properly journaled in the financial records that [Pat] provided to the Company"; and (3) "payments were made to Mr. Lee in direct contravention of specific instructions provided to [Pat] and Mark Sheehan not to make such payments, and were in violation of Section 6.11 of the Purchase Agreement."[64]

The Sheehans were terminated for cause by way of two letters on February 12, 2019.[65] At the time of their termination, Pat held 2,539,399.67 Class B Profits

---

[61] *Id.* ¶¶ 83-85.
[62] *Id.* ¶ 85.
[63] *Id.* ¶ 87.
[64] Am. Compl. Ex. 7 at 2.
[65] *See* Am. Compl. ¶ 94.

Interests and Mark held 1,316,377.04 Class B Profits Interests.[66] The termination letters refer to the Sheehans allegedly breaching various obligations.[67] Specifically, the termination letter addressed to Pat states "as detailed in a December 13, 2018 letter to [Pat], the company" believes "certain financial and accounting irregularities" demonstrate "that [Pat] violated [his] fiduciary duties and obligations to the company in connection with the transaction and [his] subsequent employment."[68] The termination letter addressed to Mark states that "the company" believes "certain financial and accounting irregularities" demonstrate "that [Mark] breached [his] fiduciary duties and obligations to the company in connection with the transaction and [his] subsequent employment."[69] Each termination letter further states that the "actions appear to have been knowingly done and intentionally concealed from the company."[70]

In accordance with the Equity Incentive Plan, Dolphin Holdco (i) cancelled the Sheehans' Class B Profits Interests and (ii) repurchased Plaintiffs' Class A-2 Interests at the Sheehans' "cost to acquire" them.[71] Under Section 3.4 of the Dolphin Holdco LPA, "[a] Partner shall automatically cease to be a Partner upon Transfer of

---

[66] *Id.* ¶ 37.
[67] *Id.* ¶ 95.
[68] Am. Compl. Ex. 8.
[69] *Id.*
[70] *Id.*
[71] *See* Am. Compl. ¶ 104.

all of such Partner's Interest."[72]   The Sheehans accordingly ceased to be Management Limited Partners of Dolphin Holdco on February 19, 2019, when their limited partnership interests were cancelled and repurchased.[73]

## F. GTCR's acquisition of AssuredPartners

On February 20, 2019, GTCR (AP) Holdings LP ("GTCR"), GTCR (AP) Merger Sub Inc., Dolphin Holdco, and Dolphin Topco executed an Agreement and Plan of Merger (the "Merger Agreement") memorializing their transaction (the "GTCR Transaction").[74]   The GTCR Transaction publicly was disclosed the following day, along with the information that it was "set to close in the second quarter of 2019."[75]  By way of the GTCR Merger Agreement, Dolphin Holdco's sole asset, AssuredPartners, was sold to GTCR through the sale of Dolphin Holdco's wholly owned subsidiary, Dolphin TopCo.  The surviving entity became a subsidiary of GTCR called Dolphin TopCo.[76]

Pursuant to the terms of the GTCR Merger Agreement, as consideration for selling AssuredPartners to GTCR, Dolphin Holdco received $2,762,000,000 in cash,[77] and some of Dolphin Holdco's interest holders received interests in GTCR

---

[72] APA § 3.4.
[73] Am. Compl. ¶ 104.
[74] *Id*. ¶ 109; Ex. 4 (hereinafter, GTCR Merger Agreement).
[75] Am. Compl. ¶ 106; Ex. 10.
[76] GTCR Merger Agreement § 2.1.
[77] GTCR Merger Agreement § 7.18; Am. Compl. ¶ 111.

16

via the issuance of Rollover Shares.[78] The GTCR Transaction closed on May 13, 2019, when a certificate of merger was filed with Delaware's Secretary of State.[79]

On February 19, 2019, AP Virginia initiated an action against the Sheehans and others in the Complex Commercial Litigation Division of the Superior Court (the "Superior Court Action").[80] The Superior Court Action relates to the events that purportedly prompted the Sheehans' termination, specifically their alleged fraud during the sale of Sheehan Insurance and post-closing payments that purportedly violated the APA.[81] On May 3, 2019, the Sheehans initiated this action in the Court of Chancery against AssuredPartners, Dolphin Holdco, Dolphin Investment, and Dolphin GP (collectively, "Defendants"), alleging breaches of their Employment Agreements (the "Court of Chancery Action"). Defendants filed a motion to dismiss the Sheehans' original complaint on May 28, 2019.

On October 4, 2019, the Sheehans filed their Amended Complaint, which is the subject of this memorandum opinion. By order dated June 13, 2019, the Delaware Supreme Court designated this judge to sit by designation in the Court of Chancery Action, so that one judicial officer could resolve the parties' overlapping and related disputes.

---

[78] GTCR Merger Agreement § 7.17; Am. Compl. ¶ 111.
[79] Regan Aff. Ex. C.
[80] Captioned *AssuredPartners of Virginia, LLC v. Sheehan et al.*, C.A. No. N19C-02-175-AML CCLD. Trans. ID 62982751.
[81] *See id.*

The second amended complaint was filed in the Superior Court Action on October 15, 2019 (the "Superior Court Complaint").[82] The Superior Court Complaint is incorporated by reference and integral to the Amended Complaint in the Court of Chancery Action because the Superior Court Complaint is referenced in the Amended Complaint and forms the basis of the Sheehans' claims in Count IX concerning damage to their reputation.[83]

On November 12, 2019, Defendants moved to dismiss the Sheehans' Amended Complaint. This Court simultaneously heard arguments on motions to dismiss in the Court of Chancery Action and the Superior Court Action (the "February 10, 2020 Hearing"). The Court took the motions to dismiss under advisement after the hearing.

## G. The Parties' Contentions

The Amended Complaint advances several claims for breach of contract, with the Sheehans requesting relief in the form of damages, specific performance, and declaratory judgment. Count I alleges a claim for breach of the Employment

---

[82] Trans. ID 64318186.

[83] *See, e.g.*, Am. Compl. ¶ 102 (alleging that the Superior Court Complaint "includes numerous defamatory statements about the Sheehans"), ¶ 194 (alleging that "allegations in the Superior Court Complaint . . . damaged the Sheehans' reputation, goodwill, and standing in the mid-Atlantic insurance community and breached Section 6 of the Employment Agreements"); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that, on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint). The Court also may take judicial notice of filings in the Superior Court. *See*, e.g., D.R.E. 202(d)(1)(C); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162 (Del. 2006); *Beiser v. PMC-Sierra, Inc.*, 2009 WL 483321, at *1 n.2 (Del. Ch. Feb. 26, 2009) (stating Court has taken judicial notice of, and is drawing on, facts from docket in parallel federal action).

18

Agreements against AP Virginia and AP Inc. and seeks a declaration that for purposes of the Equity Incentive Plan and their ownership in Dolphin Holdco, the Sheehans "were not terminated pursuant to their Employment Agreements."[84] Count II similarly alleges a claim for breach of the implied covenant of good faith and fair dealing against AP Virginia and AP Inc. and seeks relief similar to Count I. Count III seeks a declaration that the Class A-2 Interests' repurchase and Class B Profit Interests' cancellation were improper and ineffective and that the Sheehans therefore never ceased to be Management Limited Partners in Dolphin Holdco. Count IV alleges Apax Limited Partner breached Section 4.2 of the Dolphin Holdco LPA and seeks specific performance in the form of an order requiring Apax Limited Partner to allow the Sheehans to exercise their Tag-Along Rights in the GTCR Transaction. Count V alleges Dolphin Holdco breached the Equity Incentive Plan and seeks damages. Count VI alleges Dolphin Holdco converted the Sheehans' limited partnership interests and seeks an order rescinding the improper cancellation of their Class B Profits Interests and the improper repurchase of the Class A-2 Interests.

Counts VII and VIII seek damages for breach of contract and are asserted in the alternative if the Court concludes the Sheehans are not Management Limited Partners in Dolphin Holdco. Count VII alleges Dolphin Holdco breached Section 7 of the Equity Incentive Plan by failing to pay the Sheehans fair market value for their

---

[84] Am. Compl. ¶ 132.

19

interests. Count VIII alleges Dolphin GP breached Section 2.9 of the Dolphin Holdco LPA by failing to determine in good faith the fair market value of the Sheehans' interests.

Count IX alleges AP Virginia and AP Inc. breached Section 6 of the Employment Agreements and seeks damages for the harm to the Sheehans' reputation. Lastly, Count X alleges the Employment Agreements' non-solicitation and non-interference provision is not enforceable and seeks relief in the form of a declaratory judgment against AP Inc. and AP Virginia.

Summarizing their arguments generally, Defendants contend (1) the Amended Complaint fails to state any claim against them; (2) the absolute litigation privilege bars Count IX's claim for breach of the Employment Agreements' non-disparagement clause; (3) the Sheehans may not be released from the Employment Agreements' non-solicitation and non-interference provision as alleged in Count X; and (4) Counts I, II, IX, and X must be dismissed as to AP Inc. because that entity did not sign the employment agreements.

## ANALYSIS

On a motion to dismiss, the Court must determine whether the "plaintiff 'may recover under any reasonably conceivable set of circumstances susceptible of

proof.'"[85] "If [the plaintiff] may recover, the motion must be denied."[86] A court may grant the motion if "it appears to a reasonable certainty that under no state of facts which could be proved to support the claim asserted would plaintiff be entitled to relief."[87] When applying this standard, the Court will accept as true all non-conclusory, well-pleaded allegations.[88] In addition, "a trial court must draw all reasonable factual inferences in favor of the party opposing the motion."[89]

**A. Counts I, II, IX, and X are dismissed against AP Inc.**

Defendants argue Counts I, II, IX and X should be dismissed because AP Inc. cannot be bound by the Employment Agreements since it was not a signatory to the agreements. Under Delaware law, "the ordinary rule is that only the *formal parties* to a contract are bound by its terms."[90]

It is undisputed that the Sheehans and AP Virginia's predecessor are the only signatories to the Employment Agreements.[91] Plaintiffs contend that the use of the

---

[85] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del.2002)).

[86] *Holmes v. D'Elia*, 2015 WL 8480150, at *2 (Del. Dec. 8, 2015) (quoting *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[87] *Deuley v. DynCorp Int'l, Inc.*, 2010 WL 704895, at *3 (Del. Super. Feb. 26, 2010) (citing *Parlin v. DynCorp Int'l, Inc.*, 2009 WL 3636756, at *1 (Del. Super. Sept. 30, 2009) (quoting *Spence*, 396 A.2d at 968)), *aff'd*, 8 A.3d 1156 (Del. 2010).

[88] *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 724 (Del. 1960) (citing *Danby v. Osteopathic Hosp. Ass'n of Del.*, 101 A.2d 308, 315 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954)); *Nero v. Littleton*, 1998 WL 229526, at *3 (Del. Ch. Apr. 30, 1998).

[89] *Pfeffer v. Redstone*, 965 A.2d 676, 683 (Del. 2009).

[90] *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 760-61 (Del. Ch. 2009) (Strine, V.C.) (emphasis added) (finding that only the signatories to the agreement were bound by its terms), *aff'd*, 976 A.2d 170 (Del. 2009).

[91] Employment Agreements at 10.

word "Company" in the Employment Agreements' preamble makes AP Inc. a liable party. The agreements' unambiguous language compels the opposite conclusion. Specifically, the preamble provides that the agreements are "entered into between [AP Virginia], a Virginia limited liability company, with its principal place of business in Lake Mary, Florida . . . and [the Sheehans]."[92] Although the term "Company" is defined in the agreement to include AP Virginia's "affiliates, subsidiaries, parent companies, successors, and assigns" this definition does not transform these entities into parties to the Employment Agreements. Only the parties that signed the Employment Agreements had obligations thereunder.[93] Accordingly, the claims against AP Inc. in Counts I, II, IX, and X are dismissed.

**B. Count I of the Amended Complaint adequately pleads a breach of contract claim, but only as to a declaration of whether the Sheehans were terminated for "cause."**

Count I alleges AP Virginia breached the Employment Agreements by terminating the Sheehans "for cause" without a contractual basis to do so.[94] The Sheehans seek a remedy in the form of a declaration that for purposes of the Equity Incentive Plan and the ownership of their interests in Dolphin Holdco, the Sheehans never were terminated.[95] Defendants argue that Count I for breach of contract should be dismissed because (1) the Sheehans' actions constituted "Cause" as defined in the

---

[92] *Id*. at 1.
[93] *See Alliance*, 963 A.2d at 760-61.
[94] Am. Compl. ¶¶ 126-132.
[95] *Id*. ¶ 132.

Employment Agreements; and (2) the Sheehans' termination was valid and final, whether they were terminated for cause or without cause. A court may grant a motion to dismiss based on contractual language, but "only if the contractual language is unambiguous—meaning, the language is susceptible of only one reasonable interpretation."[96]

In support of their argument, Defendants refer to Section 1.4.2 of the Employment Agreements and the termination letters. Section 1.4.2 defines "Cause" to include, in relevant part:

> (i) a violation by Employee of any of the terms of this Agreement or of any written policy of the Company provided or made available to Employee (excluding any immaterial violation that does not actually harm the Company); (ii) frequent unexplained absence or other malfeasance by Employee; . . . (v) a failure to observe policies and/or standards (excluding any immaterial failure that does not actually harm or potentially harm the Company), or a failure to observe applicable laws, in each case regarding employment practices (including nondiscrimination and sexual harassment policies); . . . and/or (vii) conduct which could reasonably be expected to bring the Company or any of its affiliates into public disgrace or disrepute.[97]

The Sheehans' termination letters stated that the Sheehans "engaged in conduct that violates [their] fiduciary duties and obligations to the company in connection with the transaction and [their] subsequent employment. These actions appear to have been knowingly done and intentionally concealed from the company."[98] The

---

[96] *Fortis Advisors LLC v. Stora Enso AB*, 2018 WL 3814929, at *3 (Del. Ch. Aug. 10, 2018).
[97] Regan Aff. Exs. A-B § 1.4.2.
[98] Am. Compl. Ex. 8.

termination letters note that the allegations were "detailed in a December 13, 2018 letter."[99]

Although the termination letters purport to state a valid basis for terminating the Sheehans for cause, at this stage in the litigation the Court must "accept all well-pleaded factual allegations as true" and "draw all reasonable inferences in favor of the non-moving party."[100] The Court cannot conclude on the basis of the termination letters that the Sheehans "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[101] The Sheehans have pleaded that "AssuredPartners purposefully manufactured "cause" for the termination "in order to oust the Sheehans from Dolphin Holdco and deprive the Sheehans from receiving any benefit in connection with the GTCR[.]"[102] If the Sheehans can prove these allegations at trial, they may prevail on their breach of contract claim.

Defendants are correct, however, that the Sheehans' termination was valid and final, whether or not they were terminated for "cause." Delaware emphasizes the importance of affording parties the benefit of their bargain when interpreting

---

[99] *Id.*

[100] *Central Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)) ("The pleading standards governing the motion to dismiss stage of a proceeding in Delaware, however, are minimal. When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.").

[101] *Id.*

[102] Am. Compl. ¶ 97.

agreements.[103] Under the contract's plain meaning, the Court cannot adopt the Sheehans' argument that they were not terminated at all if there was not "cause" for the termination under the Employment Agreements.[104]

AP Virginia and the Sheehans entered into at-will employment agreements that expressly disclaimed any obligation of continued employment,[105] and AP Virginia therefore did not owe the Sheehans a duty to continue their employment. Indeed, "[s]ince an assurance of continued employment is antithetical to at-will employment, no legally cognizable harm arises solely from the termination itself."[106] Rather, the contractual duties AP Virginia allegedly breached were the obligations owed to the Sheehans post-termination.[107] AP Virginia's post-termination obligations to the Sheehans depended on the classification of the termination as "for cause" or "without cause."[108] The issue to resolved in this litigation is whether the Sheehans actually were terminated "without cause" pursuant to the Employment Agreements and thereby denied the benefits associated with a "without cause"

---

[103] *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *11 (Del. Super. Apr. 2, 2003).

[104] *See Goggin v. National Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Nov. 30, 2018).

[105] Employment Agreements § 10 ("Employee's employment with the Company is, and shall at all times be, 'at will', and nothing in this Agreement implies any obligation of continued employment of Employee by the Company."); *see also E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996) ("The presumption of at-will employment is a fixture of American law, and continues to be followed in Delaware and in the vast majority of jurisdictions.").

[106] *Pressman*, 679 A.2d at 444.

[107] Am. Compl. ¶¶ 46, 48.

[108] *Id*. ¶ 46.

classification. Given the Employment Agreements' plain terms, I cannot draw a reasonable inference to the effect that the Sheehans never were terminated in the first place. Accordingly, Count I may proceed on the grounds that the Sheehans may be entitled to a remedy in the form of a declaration that they were not actually terminated "for cause." Such a declaration would be consistent with the relief sought in the Amended Complaint that the "Sheehans were not terminated pursuant to the Employment Agreements."[109]

## C. Count II of the Amended Complaint adequately pleads a breach of the implied covenant.

Defendants argue the implied covenant claim fails because the Sheehans do not identify a gap that an implied term might fill. To sufficiently plead breach of the implied covenant of good faith and fair dealing, a complaint "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[110] Under Delaware law, the implied covenant inheres in all contracts and exists to fill contractual gaps that neither party anticipated.[111] The covenant of good faith and fair dealing "embodies the law's expectation that 'each party to a contract will act with good faith toward the other

---

[109] *Id*. ¶ 132; *see also Clemente v. Greyhound Corp*., 155 A.2d 316, 323 (Del. Super. 1959) (In the discussion of appropriate relief in a declaratory judgment case, the Court stated "generally the relief prayed in the complaint will not control the ultimate relief that may be warranted").

[110] *Kuroda v. SPJS Holdings, L.L.C*., 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[111] *Dieckman v. Regency GP, LP*, 155 A.3d 358, 367 (Del. 2017).

with respect to the subject matter of the contract.'"[112] The covenant protects an agreement's spirit against underhanded tactics that deny a party the fruits of its bargain.[113] In the context of employment-at-will, "Courts have been reluctant to recognize a broad application of the [implied c]ovenant out of a concern that the [implied c]ovenant could thereby swallow the [employment-at-will d]octrine and effectively end at-will employment."[114] Still, a violation of the implied covenant may result from "an act or acts of the employer manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to create fictitious grounds to terminate employment."[115]

The Employment Agreements lay out two types of terminations and a process applicable to each. The Amended Complaint identifies a possible gap, specifically that a termination will not be done in "bad faith."[116] The Amended Complaint alleges the parties reasonably expected at the time they entered the Employment Agreements that AP Virginia would not terminate the Sheehans in bad faith.[117] To prove that AP Virginia failed to exercise its discretion in good faith, and thus breached this implied covenant, the Sheehans must prove at trial that AP Virginia

---

[112] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).
[113] *Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *4 (Del. Super. Oct. 31, 2006) (citing *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939, at *10 (Del. Super. Jan. 17, 2002)).
[114] *Pressman*, 679 A.2d at 442.
[115] *Id*. at 444.
[116] Am. Compl. ¶ 137.
[117] *Id*. ¶¶ 137-139.

exercised its discretion in bad faith.[118]  To survive a motion to dismiss, however, the Sheehans only must allege that the termination decision was motivated by an improper purpose.[119]  In *MHS Capital LLC v. Goggin*, the Court of Chancery determined that "a plaintiff need not plead knowledge or state of mind with particularity, because 'any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable.' The purpose of Rule 9(b) is to provide the defendant with "detail sufficient to apprise [her] of the basis for the claim."[120]

The Amended Complaint's allegation that AP Virginia terminated the Sheehans "in order to steal [their] Class B Profits Interests for zero consideration and to pay nothing more than cost for the Sheehans' Class A-2 Interests" adequately pleads that "the defendant's conduct [was] driven by an improper purpose."[121] Moreover, whether the Sheehans are entitled to damages distinct from their contract claim must await determination at a later stage.  Count II's allegations are sufficient, at this stage of the proceedings, to allow the Sheehans' claim to proceed.

## D. Count III of the Amended Complaint is duplicative of other claims.

Defendants argue that Count III should be dismissed because the Sheehans essentially are requesting relief identical to Counts I and II.  In response, the

---

[118] *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at \*5 (Del. Ch. Nov. 9, 2009).
[119] *Id*.
[120] *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at \*9 (Del. Ch. May 10, 2018).
[121] Am. Compl. ¶ 15.

Sheehans allege that Count III seeks the logical conclusion set up by the premises of Counts I and II: because the Sheehans' termination was not performed in good faith and was ineffective pursuant to the employment agreement, "the repurchase of the Sheehans' Class A-2 Interests and the cancellation of the Sheehans' Class B Profit Interests were improper and ineffective and . . . the Sheehans never ceased to be holders of interests in Dolphin Holdco."[122]

Count III does not assert a claim or seek relief distinct from Counts I and II. Moreover, Count III also fails in that it relies on the Court finding that the Sheehans still would be Management Limited Partners under the Employment Agreements if there was no "cause" for their termination. The Sheehans' attempt to be restored to their former status as Management Limited Partners of Holdco ignores the express provisions of the Equity Incentive Plan and the Dolphin Holdco LPA.[123] Accordingly, Count III is dismissed.

**E. Count IV fails to state a claim for breach of the Dolphin Holdco LPA.**

The basis of Count IV arises out of the sale of Dolphin Topco (the "Topco Transaction") by Dolphin Holdco to a GTCR affiliate. Apax Limited Partner is Dolphin Holdco's majority limited partner.[124] Although Apax Limited Partner is not

---

[122] Am. Compl. ¶ 153.

[123] Equity Incentive Plan § 7; Dolphin Holdco LPA § 3.4 ("A Partner shall automatically cease to be a Partner upon Transfer of all of such Partner's Interest in accordance with this Agreement.").

[124] Am. Compl. ¶ 26. The entity's name actually is Dolphin Investment, but this Opinion adopts the terminology used in the Amended Complaint.

a party to the Merger Agreement, the Sheehans nevertheless contend that it "transferred its interests in Dolphin Holdco in exchange for the GTCR Transaction consideration."[125]  The Amended Complaint alleges that Apax Limited Partner had an obligation under Section 4.2 of the Dolphin Holdco LPA to cause GTCR "to offer to the Sheehans the opportunity to transfer their partnership interests on the same economic terms as those offered to Apax Limited Partner or Apax VIII[,]" meaning they should have had the opportunity to "receive[] interests in GTCR, via the issuance of Rollover Shares."[126]  Section 7.17 of the GTCR Merger Agreement allowed Dolphin Holdco shareholders to rollover their equity into GTCR.[127]  Under Section 7.17, Dolphin Holdco shareholders could exchange their equity and were entitled to receive up to "95% of the amount of Merger Consideration that such Rollover Equityholder would be entitled to if [Dolphin Holdco] distributed the Merger Consideration . . . to its equityholders in accordance with its governing documents[.]"[128]  The Amended Complaint alleges that Apax Limited Partner breached its obligation when it did not cause the Sheehans to be offered that opportunity.[129]

---

[125] *Id.* ¶ 158.
[126] *Id.* ¶¶ 111, 159; GTCR Merger Agreement § 7.17.
[127] GTCR Merger Agreement § 7.17.
[128] *Id.*
[129] Am. Compl. ¶ 160.

Defendants argue that Count IV fails to state a claim because (1) the Sheehans held no equity in Dolphin Holdco at the time of the GTCR Transaction, (2) the GTCR Transaction did not implicate Section 4.2 of the Dolphin Holdco LPA because there was no "transfer" triggering Section 4.2, and (3) the Sheehans are not entitled to specific performance.

As to their first argument, Defendants are correct that the Sheehans did not hold equity when the GTCR Transaction closed because they were terminated before that date, regardless of whether they were terminated "with cause" or "without cause." The GTCR Transaction was not signed until after the Sheehans had ceased to be limited partners.[130] By the time Apax Limited Partner's obligations regarding the GTCR Transaction could have arisen, Plaintiffs' limited partnership interests already had been repurchased and cancelled. Plaintiffs therefore had no rights under the Dolphin Holdco LPA by the time of the GTCR Transaction.

Moreover, even if the Sheehans did retain rights under the Dolphin Holdco LPA, Defendants are correct that the transaction did not implicate Section 4.2. Under any reasonable interpretation of Section 4.2 of the Dolphin Holdco LPA or Section 7.17 of the Merger Agreement, the Tag-Along Rights were not triggered.

Section 4.2(a) of the Dolphin Holdco LPA provides:

The Apax Limited Partner (the Selling Limited Partner) shall not sell or otherwise Transfer all or any number of its Class A-1 Units (other

---

[130] *Id.* ¶¶ 104, 106.

than to a Permitted Transferee or pursuant to a Required Sale or Initial Public Offering, or as contemplated by Section 4.6(a)) unless the terms and conditions of such Transfer include an offer, on the same economic terms and conditions as the offer by the proposed third party transferee to the Selling Limited Partner, to each of the other Limited Partners who is not the Selling Limited Partner or the proposed third party transferee (if such purchaser is a Limited Partner) (collectively, the "Tag Offerees"), to include at the option of each Tag Offeree, in the sale or other Transfer to the third party transferee, a number of Class A-2 Units owned by each Tag Offeree determined in accordance with this Section 4.2.[131]

To summarize, Section 4.2 affords the limited partners certain Tag-Along Rights—but only when Apax Limited Partner is "sell[ing] or otherwise Transfer[ing] all or any number of its Class A-1 Units."[132] The GTCR Transaction did not involve a transfer of Apax Limited Partner's Class A-1 Units.

As the Merger Agreement itself provides, the GTCR Transaction involved Dolphin Holdco selling its wholly owned subsidiary, Dolphin Topco.[133] The Plaintiffs point to *Borealis Power Hldgs. Inc. v. Hunt Strategic Utility Investment, L.L.C.* as support for their contention that a transfer of the A-2 stockholders' interest in Dolphin L.P. effectively occurred through the Topco Transaction.[134] The Sheehans contend that the Dolphin Topco sale occurring "two levels below" Dolphin Holdco in the corporate chain was the "same thing" as the sale in *Borealis* where the

---

[131] Dolphin Holdco LPA § 4.2(a).
[132] *Id.*
[133] *See* GTCR Merger Agreement.
[134] *See* Letter dated Feb. 7, 2020 to The Honorable Abigail M. LeGrow from Martin S. Lessner, Esq. enclosing an opinion that Chancery Plaintiffs may rely on during February 10, 2020 oral argument.

Court of Chancery held that a sale of interests "two levels up" the chain of two wholly owned entities fit the broad definition of "Transfer" in an investor rights agreement.[135] As an initial matter, the Sheehan's reliance on *Borealis* is misplaced because *Borealis'* reasoning applies to whether a sale two levels up the corporate chain is a transfer of a subsidiary's interest, the reverse of the factual scenario before this Court.

More importantly, however, the Delaware Supreme Court recently reversed the Court of Chancery's decision in *Borealis*.[136] And, the Delaware Supreme Court's decision in *Borealis* supports the conclusion that the GTCR Transaction did not trigger the Tag-Along Rights. In *Borealis*, the Supreme Court held that a right of first refusal triggered by a "Minority Member's" transfer of its LLC Units was not implicated by the sale of an interest in the Minority Member itself.[137] The right of first refusal depended on a Minority Member transferring its units in the LLC, which did not occur when one of the Minority Member's owners sold its interest in the Minority Member. The "subject" of the right of first refusal, i.e. the "Minority Member," controlled the analysis.[138] Similarly, the subject of Section 4.2—Apax

---

[135] *See* 2020 WL 363670 at *14-15 (Del. Ch. Jan. 22. 2020); *see also* Transcript of Motions held on 2-10-20 before The Honorable Abigail M. LeGrow, Trans. 65555751, at 156:19-157:18;
[136] 2020 WL 2630929 (Del. May 22, 2020).
[137] *Id*. at *6.
[138] *Id*.

Limited Partner—is important. Apax Limited Partner did not sell its Class A-1 Units in the GTCR Transaction, and Section 4.2 therefore does not apply.

**F. Counts V and VII fail to state a claim that Dolphin GP and Dolphin Holdco breached any obligation under the Equity Incentive Plan.**

Count V does not allege that Dolphin GP breached any contractual obligation it owed the Sheehans. The Sheehans allege "Dolphin GP has the duty to make any decision related to employment for purposes of the Equity Incentive Plan in good faith. (Equity Incentive Plan §§ 2, 9(n).)"[139] The Sheehans contend Dolphin GP breached Sections 2 and 9 of the Equity Incentive Plan by determining in bad faith that the Sheehans were terminated for cause. Section 2 defines "Employment" and "termination of employment" and provides, among other things, that "All determinations regarding employment and service (for purposes of administering the [Equity Incentive Plan] or any Award Agreement) shall be made by [Dolphin GP] in its sole discretion."[140] Section 9(n) states that any reference to "a sole discretion scope of [Dolphin GP's] authority shall mean that such discretion shall be exercised in good faith."[141] Section 2 and Section 9(n) alone do not establish that Dolphin GP has any right or obligation to make a determination regarding whether an employee was terminated with or without cause. Section 2's requirement for Dolphin GP to make its determinations in its sole discretion only applies where the Equity Incentive

---

[139] Am. Compl. ¶¶ 167-68. Those allegations are sufficient to state a claim under Delaware law.
[140] Equity Incentive Plan § 2.
[141] *Id*. § 9(n).

Plan has specified Dolphin GP has the ability to make such a determination. Count V fails to identify any such contractual obligation or discretion applicable to this case and therefore fails to state a claim.[142]

Count VII similarly does not allege that Dolphin Holdco breached any contractual obligation it owed the Sheehans. Count VII alleges Dolphin Holdco breached Section 7 of the Equity Incentive Plan by failing to repurchase the Sheehans' interests at Fair Market Value. But, Sections 7(b) and 7(c), which are the provisions of the Equity Incentive Plan under which Units would be repurchased, do not require Dolphin Holdco to make any determination about the merits of Plaintiffs' termination. Sections 7(b)(ii) and 7(c)(ii) apply automatically "[i]n the event of a termination of a Participant's Employment . . . by the Employer for Cause."[143] Because the "Employer" (AP Virginia) terminated the Sheehans for cause, Dolphin Holdco was required to pay for Plaintiffs' Class A-2 Interests "the lesser of (x) Fair Market Value and (y) the Participant's cost to acquire such Class A-2 Unit[s]."[144] The same calculus applies to Class B Profits Interests.[145] Like their claims in Count V, the Sheehans do not explain how Sections 7(b)(ii) and 7(c)(ii) afford Dolphin Holdco any discretion once it receives notice of a "for cause" termination by an

---

[142] *But, see* Count VIII, *infra*.
[143] *Id*. §§ 7(b)(ii), (c)(ii).
[144] *Id*. § 7(c)(ii).
[145] *See id*. § 7(b)(ii)).

employer. Count VII fails to identify a contractual obligation and therefore fails to state a claim.

**G. Count VI states a conversion claim, but it is duplicative of the breach of contract claims.**

The Sheehans' conversion claim against Dolphin Holdco seeks restoration of their Class B Profits Interests and Class A-2 Interests.[146] Defendants argue this claim is barred because it is duplicative of the Sheehans' claims for breach of contract related to the wrongful cancellation and repurchase of the interests. Plaintiffs' breach of contract claims against Holdco seek monetary compensation for those same interests.[147] "Under Delaware law, a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort."[148]

Defendants are correct that the Sheehans' contractual claims against Dolphin Holdco seek monetary compensation for those same interests.[149] It is well settled under Delaware law that a plaintiff cannot bring a claim of conversion arising solely out of a breach of contract claim.[150] Count VI therefore is dismissed.

---

[146] *See* Am. Compl. ¶ 174.

[147] *See id.* ¶ 181.

[148] *See West v. Access Control Related Enters., LLC*, 2019 WL 2385863, at \*4 (Del. Super. Ct. June 5, 2019) (citation omitted) (dismissing conversion claim as duplicative); *Kuroda v. SPJS Hldgs., Inc.*, 971 A.2d 872, 889 (Del. Ch. Apr. 15, 2009) (ruling that "the complaint fails to state a claim for conversion because the claim is duplicative of Kuroda's breach of contract claim"); *see also Data Mgmt. Internationalé, Inc. v. Saraga*, 2007 WL 2142848, at \*3 (Del. Super. July 25, 2007) (ruling that plaintiff only may bring a conversion claim alongside a contract claim where the plaintiff alleges the defendant breached a tort duty independent of any obligations imposed by the contract).

[149] *See* Am. Compl. ¶ 181.

[150] *See West*, 2019 WL 2385863 at \*4-5.

36

**H. Count VIII states a claim against Dolphin GP for breaching Section 2.9 of the Dolphin Holdco LPA.**

Count VIII alleges Dolphin GP breached Section 2.9 of the Dolphin Holdco LPA by making a value determination in bad faith. Specifically, Plaintiffs challenged Dolphin GP's determination that the fair market value of the Sheehans' interests was the amount the Sheehans originally paid for them rather than the amount other limited partners of Dolphin Holdco received in the GTCR Transaction.[151] Defendants argue that Count VIII fails because Dolphin GP was not required to make any determination under the Equity Incentive Plan.

As stated above, the Court finds that the Sheehans may be able to prove that they were terminated "without cause" and were entitled to the corresponding Equity Incentive Plan benefits. Count VIII therefore presents two contractual issues. First, is Dolphin GP's value determination discretionary under Section 6? Second, does any such discretion allow Dolphin GP to make a final determination as to what Equity Incentive Plan benefits an employee may receive upon termination?

Section 6 of the Equity Incentive Plan details that, generally, a Participant Employee's "Units will be issued, transferred or sold pursuant to an Award Agreement."[152] In its sole discretion, the General Partner "may establish conditions under which vesting or restrictions on Units"[153] lapse over a period of time and also

---

[151] Am. Compl. ¶¶ 185-186.
[152] Equity Incentive Plan § 6(a).
[153] *Id.*

37

may determine "the number and type of Units to be issued, transferred or sold and the restrictions applicable to Such Units."[154]  Upon an employee's termination, however, that employee's Award Agreement also terminates, along with any unvested interest, and the Equity Incentive Plan's repurchase provisions apply as to that terminated employee's vested interests.[155]  Specifically, Section 6(c) of the Equity Incentive Plan provides:

> Except as otherwise provided in an Award Agreement, if a Participant's Employment is terminated, (i) the Award Agreement shall terminate as to all Class B Profits Interest Units covered by the Award which remain unvested and such Class B Profits Interest Units shall be forfeited without consideration, as set forth in the Award Agreement and (ii) all Units issued, transferred or sold to such Participant will be subject to repurchase provisions set forth in the [Equity Incentive Plan] and/or the applicable Award Agreement. The General Partner may, however, provide for complete or partial exceptions to this requirement as it deems appropriate in its *sole discretion*.[156]

Critically, the General Partner's "sole discretion" standard is implicated in Section 6(c) with regard to the terminated employee's vested interests.  The "sole discretion" standard in Section 2.9 of the Dolphin Holdco LPA provides that, "[w]ith respect to any matters provided hereunder as to which Limited Partner's rights are determined based upon the value of its Units or otherwise, the GP Board shall make such determination of value in good faith and, if applicable, in accordance with the

---

[154] *Id*. § 6(b).
[155] *Id*. § 6(c)
[156] *Id*. (emphasis added).

definition of 'Fair Market Value.'"[157]  Therefore, Dolphin GP has a duty to exercise its discretion to make exceptions under Section 6(c) in good faith.  Through the granting of complete or partial exceptions, Dolphin GP may alter an employee's rights under the Equity Incentive Plan's repurchase provisions.  Count VIII alleges Dolphin GP exercised its discretion in bad faith and in order to deprive the Sheehans of the value of their interests.  Under Rule 12's minimal pleading standards, Count VIII states a claim for breach of contract.

**I. Count IX is dismissed because the absolute litigation privilege applies to the Defendants' alleged statements.**

Count IX alleges that AP Virginia breached Section 6 of the Employment Agreements by making allegations in "the Superior Court Complaint that damaged the Sheehans' reputation, goodwill, and standing in the mid-Atlantic insurance community."[158]  Section 6 of the Employment Agreements provides that AP Inc. and AP Virginia are obligated to "refrain from all conduct, verbal or otherwise, that disparages or damages or could reasonably be expected to disparage or damage the reputation, goodwill or standing in the community of the [Sheehans] … and their respective affiliates or employees."[159]  The Sheehans owe a reciprocal obligation to the Company.  Defendants argue that Count IX should be dismissed because it is barred by the absolute litigation privilege.

---

[157] Am. Compl. ¶ 186; Dolphin Holdco LPA §2.9.  *See also* Equity Incentive Plan §9(n).
[158] *Id*. ¶ 194.
[159] Employment Agreements § 6.

The absolute litigation privilege "affords a complete defense [to the tort of defamation] irrespective of accuracy or malice."[160] This privilege is absolute because "the interest in encouraging a litigant's unqualified candor as it facilitates the search for truth is deemed so compelling that the privilege attaches even where the statements are offered maliciously or with knowledge of their falsity."[161] In Delaware, there is no "sham litigation" exception to the absolution litigation privilege defense.[162] Derogatory statements made in the course of judicial proceedings are privileged, "regardless of the tort theory by which the plaintiff seeks to impose liability."[163]

Although no Delaware court directly has addressed this issue, the policy underlying the absolute litigation privilege compels the conclusion that it applies to claims arising in contract as well as in tort. In *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, the plaintiff sought injunctive relief to prevent the defendant from making statements in the course of litigation that allegedly violated the non-disparagement clause of their subscription agreement.[164] The Court of Chancery rejected the plaintiff's claim, finding that "the absolute litigation privilege, and the

---

[160] *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *12-13 (Del. Ch. 2019) (quoting *Short v. News-Journal Co.*, 212 A.2d 718, 720 (Del. 1965)).

[161] *Barker v. Haung*, 610 A.2d at 1345 (quoting *Nix v. Sawyer*, 466 A.2d 407, 411 (Del. Super. 1983)).

[162] *Id.*

[163] *Ritchie*, 2019 WL 2319284, at *13 (quoting *Barker*, 610 A.2d at 1345).

[164] *Id.*

public interests behind it, prevent equity from specifically enforcing, prospectively, the contractual non-disparagement clause in the context of litigation."[165] Although the Court of Chancery refrained from answering definitively whether a party disparaged in litigation could seek damages under a contractual non-disparagement clause, it noted that a number of other states have applied the absolute litigation privilege to breach of contract actions where such application furthers the policies underlying the privilege.[166] The extension of the absolute litigation privilege to contractual damages claims would further the same policies touched upon in *Ritchie*. The Court of Chancery explained:

> Far from vindicating contractual rights, such a use of equity would, in fact, render contract rights effectively unenforceable. That is, if a breaching party can prevent its counterparty, via injunction, from making "disparaging" statements in litigation alleging the breach, then the counterparty would be unable to enforce the contract because it could not effectively prosecute, or even prosecute at all… By extension, the absolute litigation privilege prohibits (at least) the equitable prohibition of litigation-related utterances, under the rubric of a contractual non-disparagement clause. Such an injunction would impermissibly chill the pursuit of justice via litigation, no less so than permitting analog tort claims in the litigation context.[167]

Plaintiffs' claim for contractual damages raises the same concerns of potentially chilling litigation. Moreover, the application of the non-disparagement clause to

---

[165] *Id.*
[166] *Id.* at *13 (citing *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377 (7th Cir. 2010); *Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2003); *Wentland v. Wass*, 25 Cal. Rptr. 3d 109, 114 (Cal. Ct. App. 2005)).
[167] *Ritchie*, 2019 WL 2319284, at *14.

41

statements in litigation has potentially never-ending implications. First, since the obligation is reciprocal, Defendants likely will assert their own counterclaims if permitted to do so. Second, each subsequent similar statement during the litigation theoretically could spawn a new claim or additional damages. Trial inevitably would devolve into a sideshow regarding the veracity and effect of each challenged statement. In short, applying the absolute litigation privilege to a contractual damages claim furthers its purpose and policies. Accordingly, Count IX is dismissed.

**J. Count X states a claim for relief from the Employment Agreements' obligations.**

Count X seeks a declaration that because Counts I and II amount to material breaches of the Employment Agreements, the Sheehans should be excused from performing their post-termination non-solicitation and non-interference obligations.

As stated above, Counts I and II adequately are pleaded against AP Virginia. These counts allege that AP Virginia deprived the Sheehans of the benefit of the Employment Agreements and that AP Virginia breached this provision in bad faith. Moreover, the alleged breach itself is "one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."[168]

---

[168] *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016).

42

Count X therefore survives because the Sheehans could prove there was a material breach of the Employment Agreements.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is **GRANTED** as to Counts III, IV, V, VI, VII, and IX, and **DENIED** as to Counts I, II, VIII, and X. **IT IS SO ORDERED**.